IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERNEST FOYE, KELVIN HOLLY, and** | : | **CIVIL ACTION** |
| **LEGENE EDWARDS,** | : | |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SEPTA and DARREN VOGELMAN,** | : | **No. 15-1036** |
| *Defendants*. | : | |

# M E M O R A N D U M

PRATTER, J.                                                                 MARCH 28, 2017

Plaintiffs Ernest Foye, Kelvin Holly, and Legene Edwards, all African-American bus operators, sued their former employer, the Southeastern Pennsylvania Transportation Authority ("SEPTA") and Darren Vogelman, their supervisor. Each plaintiff alleges claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. § 951 *et seq.* ("PHRA"), and 42 U.S.C. §§ 1981 and 1983. In addition, Mr. Edwards separately alleges that Defendants violated his rights under the Family and Medical Leave Act of 1993, 29 U.S.C § 2601 *et seq.* ("FMLA").

Defendants have moved for summary judgment as to each Plaintiff. They have also moved to strike portions of the declarations submitted by Mr. Holly and Mr. Edwards. For the reasons set forth below, the Court will grant summary judgment for Defendants as to Mr. Foye's, Mr. Holly's, and Mr. Edwards's claims under Title VII, the PHRA, and 42 U.S.C. §§ 1981 and

1983.  The Court also grants summary judgment with respect to Mr. Edwards's claims under the FMLA.[1]

## I.      FACTUAL AND PROCEDURAL BACKGROUND[2]

The following facts are undisputed unless otherwise described.  Where there is a dispute, the facts are presented necessarily in the light most favorable to Plaintiffs.  *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 267 (3d Cir. 2001).  While Plaintiffs bring the same types of claims against Defendants, the facts of their individual cases differ.

### A.      Kelvin Holly

Mr. Holly, who is African-American, worked for SEPTA as a bus operator in the Southern Division.   Mr. Vogelman was the Director of Transportation in that Division.

The terms and conditions of Mr.  Holly's employment were governed by a Collective Bargaining Agreement ("CBA") between SEPTA and the Transport Workers' Union Local 234.  The "performance" track of the CBA outlines six steps of progressive discipline applicable to employees: (1) verbal warning; (2) written warning; (3) one day suspension; (4) three day suspension; (5) Discharge with Dignity; (6) discharge.  At the Discharge with Dignity stage, employees may enter into a "Last Chance Agreement" in lieu of discharge.  A Last Chance Agreement consists of a one-day suspension followed by a one-year probationary period.  Employees are allowed one Last Chance Agreement in their SEPTA career.  Mr. Holly entered

---

[1] Because the Court concludes that Plaintiffs have not established a genuine dispute of material fact, Defendants' motion to strike various paragraphs from Mr. Holly's and Mr. Edwards's declarations—submitted in support of their oppositions to the defense motions—is moot.

[2] The Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

into a Last Chance Agreement with SEPTA as part of a Union grievance arising from performance-related violations on August 23, 2013.[3]

On or about September 27, 2013, Mr. Holly was involved in an incident with a pedestrian. According to the incident report signed by Mr. Holly, a pedestrian walked to the curb and the right side mirror of Mr. Holly's bus struck the left side of a pedestrian's head, knocking his glasses off. Mr. Holly did not call the SEPTA Control Center at that time. He stopped the bus and spoke with the pedestrian, who stated that he was fine. Mr. Holly then adjusted the right side mirror of the bus and drove the bus to SEPTA's Southern Depot, completing his "run." Once he arrived at the Depot, he reported the incident to the Control Center. Mr. Holly did not hand out incident report cards to passengers or get the name and contact information of the pedestrian.

Mr. Holly was required to follow SEPTA's Bus Division Rules ("BDR") and Authority Standard Rules ("ASR"). Following the incident, he was charged with violating:

- ASR 12.A, which requires employees to report incidents by the quickest means of communication;

- BDR 53.A & B, which requires employees to "immediately contact the Control Center in the event they are involved in any accident, blockade, or mishap," and "[i]f witnessing or involved in an accident with persons or to property, however slight, the employee shall immediately contact Control Center . . . 'tag' the event if camera equipped and attempt to obtain the names of all witnesses as soon as practical . . .

- Violation of Last Chance Agreement, which involves immediate discharge for an employee on "last chance" probation charged with committing an infraction for which discipline is justified.

Def. Statement of Undisputed Facts ¶ 20. The grievance procedure under the CBA involves four steps: (1) an informal hearing where the employee is made aware of charges against him and the

---

[3] The Agreement stated: "While on 'last chance' probation, should Mr. Holly be charged with committing any infraction for which discipline is justified, he shall be subject to immediate discharge." (Def. Ex I).

proposed discipline; (2) a formal hearing; (3) a hearing conducted by a SEPTA Labor Relations Manager; and (4) arbitration if the Union grievances are denied at steps (2) and (3) and the Union elects to pursue arbitration.  In Mr. Holly's case, the Assistant Director for the Southern Division recommended discharge at the informal hearing, and the Union's subsequent grievance was denied at the formal hearing level and the Labor Relations level.  The Union elected not to arbitrate.  Mr. Holly invokes 42 U.S.C. §§ 1981 and 1983, Title VII, and the PHRA.

**B.    Ernest Foye**

Mr. Foye is an African-American former SEPTA bus operator, who worked out of the Southern Division.  Like Mr. Holly, he was a member of the Transport Workers' Union Local 243 and was subject to the same Collective Bargaining Agreement, Authority Standard Rules, and Bus Division Rules.

On September 9, 2013, Mr. Foye was involved in an incident with an individual while operating a SEPTA bus.  At first, the individual stood in front of Mr. Foye's stopped bus, blocking its path.  The individual then moved to the bus's open front door of the bus and placed his hand in the bus's doorway while the door was closing.  With the individual's hand caught in the door, Mr. Foye drove the bus forward for approximately ten feet, at which point Mr. Foye stopped the bus, opened the doors, and pushed the individual back from the bus. Mr. Foye then allowed the individual to board the bus.  When the individual got off the bus and was running alongside it, Mr. Foye drove precariously close to him and did not abide by a STOP sign.  This entire series of events was captured by video surveillance on Mr. Foye's bus.

Mr. Foye was charged with an array of rule violations, and he proceeded with the CBA's four-step grievance process.  At the informal hearing, Mr. Vogelman recommended that Mr. Foye be discharged.  The Union's subsequent grievances at the formal hearing level and the

4

Labor Relations level were denied, and it did not pursue arbitration.  During the grievance

proceedings, Mr. Foye admitted that he had made several "terrible mistakes" and took full

responsibility for his actions.  *See* Def. Ex. E.  Mr. Foye also makes his claims under 42 U.S.C.

§§ 1981 and 1983, Title VII, and the PHRA.

### C.      Legene Edwards

Mr. Edwards is an African-American former SEPTA bus operator who worked out of the

Southern Division.  Like the other Plaintiffs, Mr. Edwards was a member of Local 234 and was

subject to the CBA between the Union and SEPTA.

The CBA outlines a no fault attendance points system whereby points are assessed

against employees for incidents of non-attendance.  An employee who accumulates twenty (20)[4]

or more points is subject to progressive discipline.  Points are reduced for regular attendance and

completion of progressive discipline.  Points are not incurred for FMLA leave.

Under the CBA, an employee who accumulates 20 or more points will be subject to

progressive discipline each time his point total reaches 20 points.  Def. Ex. C.  Progressive

discipline under the "attendance track" includes: (1) a one-day suspension; (2) a five-day

suspension; (3) Discharge with Dignity; (4) Discharge.[5]  As explained above, the CBA also

provides for a "Last Chance Agreement," which an employee can choose in lieu of discharge.[6]

SEPTA's FMLA Policy allows eligible employees up to 12 weeks of unpaid, job-

protected leave per year to care for a qualifying family member (such as a spouse) with a serious

---

[4] The 20-point threshold for discipline is increased two points for every five years of service.

[5] The CBA also includes a generalized progressive discipline scheme, which provides, "[w]hen appropriate, progressive discipline will be imposed as follows [1] Verbal Warning [2] Written Warning [3] 1-Day Administrative Suspension [4] 3-Day Suspension . . . [5] Discharge."  Def. Ex. C (sequential numbers added).

[6] A letter agreement between the Union and SEPTA clarifies that "[i]n the event that an employee, who has been discharged and is awaiting the 'Last Chance' agreement, should commit a rule infraction that warrants discipline, and/or accumulates a sufficient amount of points for the next step of discipline, the employee will be discharged."  Def. Ex. E.

health condition.  That permitted leave may be taken continuously, or on an intermittent or

reduced schedule basis.  SEPTA's FMLA Policy requires that an employee properly and timely

notify his supervisor, manager, or dispatcher, as well as AmeriHealth, the Third Party

Administrator ("TPA") that handles FMLA matters for SEPTA, that he is taking FMLA-

qualifying leave.  "If an employee does not contact the TPA, he/she may not qualify for FMLA

and may be subject to disciplinary action for attendance infractions."  Pl. Ex. P-1.

Employees are also required to provide information to AmeriHealth in order to process

FMLA claims. The FMLA Policy states:

> Employees are obligated to cooperate with the TPA in the flow of information
> necessary to administer FMLA leave. This includes, upon request, submitting a
> complete and sufficient certification to support the need for leave. Failure to do so
> may result in some or all of an absence not being treated as FMLA leave.
>
> For leaves involving a serious health condition, the employee will be required to
> have his/her treating health care provider complete a Medical Certification Form
> in a timely manner. . . . It is the employee's responsibility to submit the form to
> the TPA in a timely manner, which means the employee must make a diligent,
> good faith effort to return the form within fifteen (15) calendar days from the date
> the form is issued to the employee.

Pl. Ex. P-1.  The Policy explains that the "TPA, upon receiving all information to substantiate the

employee's need and eligibility for FMLA, is solely responsible for approval or rejection of [the]

request."  Pl. Ex. P-1.

In July 2008, Mr. Edwards received FMLA leave to care for his wife, who was battling

cancer.  Between 2008 and 2012, Mr. Edwards renewed his applications for FMLA leave several

times, and numerous absences were approved as FMLA-protected, for which he did not incur

points under SEPTA's attendance points system.  On May 15, 2013, however, Mr. Edwards

received a Discharge with Dignity for otherwise accumulating too many attendance points, and

the Union grieved the decision.[7]  As a result of the Discharge with Dignity, Mr. Edwards's

attendance points were reduced by 10.

The Union had until August 2, 2013 to request a Last Chance Agreement, and it timely

submitted such a request.[8]  In between the May 15, 2013 Discharge with Dignity and the Union's

request for a Last Chance Agreement Mr. Edwards was assessed attendance points for numerous

absences.  After exceeding the points threshold on June 24, 2013, he was again charged with

substandard attendance.  The informal hearing addressing that charge was held in abeyance on

June 26, 2013.

On August 12, 2013, Mr. Edwards executed the Last Chance Agreement that the Union

requested in response to his grievance of the May 15, 2013 Discharge with Dignity.  The

Agreement outlined that he would serve a one-day suspension without pay on August 20, 2013,

but that the one year probationary period began running on May 15, 2013—the date of his

discharge with dignity.  It explained that should Mr. Edwards be charge with committing any

infraction for which discipline is justified while on probation, he would be subject to immediate

discharge.  Mr. Edwards's employment was terminated on August 12, 2013 for his having

violated the Last Chance Agreement.

The Union grieved Mr. Edwards's discharge for violation of the Last Chance Agreement.

It took the position that SEPTA should not have assessed attendance points against Mr. Edwards

---

[7] As part of the grievance process for the May 15, 2013 Discharge with Dignity, the Union requested an attendance points audit.  Two additional points were added to Mr. Edwards's point total as a result of the audit from an absence in August 2011.

   According to the Formal Hearing disposition, Mr. Edwards had exceeded the allowable points threshold on March 18, 2013 and was subject to a Discharge with Dignity.  The Union grieved the discipline, but it was denied at the Formal Hearing and Labor Relations Level.

[8] The letter denying the grievance at the Labor Relations step explained that "if the authority does not receive a 'last chance' request as a final settlement of this grievance or a demand for arbitration by August 2, 2013, the discharge of Legene Edwards [] will become effective and he will be removed from service immediately."  Def. Ex. L.

for his June 24, 2013 absence because it was protected leave under the FMLA.  The Union also challenged SEPTA's assessment of attendance points for Mr. Edwards's August 16, 2011 absence, which was discovered during the audit in the previous grievance, and it generally objected to SEPTA's decision to hold the grievance in abeyance until the work resumption agreement was signed.  The grievance regarding Mr. Edwards's violation of the Last Chance Agreement was denied at the Formal Hearing and Labor Relations steps.  The Union did not pursue arbitration.

Mr. Edwards, too, brings his claims under 42 U.S.C. §§ 1981 and 1983, Title VII, the PHRA, and the FMLA.

## II.    LEGAL STANDARDS

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(c).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in that party's favor.  *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).  A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Where the non-

8

moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden may be met by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.   Summary judgment is proper if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## III.   DISCUSSION

These Plaintiffs' claims, albeit arising from different factual circumstances, are subject to the same legal inquiry.   Accordingly, the Court will address their common claims under Title VII, PHRA, and 42 U.S.C. §§ 1981 and 1983 and then turn to Mr. Edwards's FMLA claims.

### A.       Claims Under Title VII, the PHRA, and 42 U.S.C. §§ 1981 and 1983

Each Plaintiff claims that SEPTA has discriminated against him on the basis of race in violation of Title VII, the PHRA, [9] and § 1981.   Plaintiffs' § 1981 claims against Mr. Vogelman are analyzed in the same manner as their claims under Title VII and the PHRA.   *Jordan v. Se. Pennsylvania Transp. Auth.*, No. CIV.A. 10-3470, 2012 WL 4815414, at *16 (E.D. Pa. Oct. 10, 2012).   The Third Circuit Court of Appeals has held that § 1981 does not provide an independent cause of action against state governmental units like SEPTA, and instead, § 1983 provides the exclusive remedy against state governments for violation of rights guaranteed in, or by, § 1981.   *See McGovern v. City of Phila.*, 554 F.3d 114, 121 (3d Cir. 2009); *see also Taylor v. Se. Pa. Transp. Auth.*, 2007 WL 1074887, at *2 (E.D. Pa. Apr. 5, 2007) ("SEPTA is treated as a

---

[9] The protections of the PHRA replicate those provided by Title VII, so the claims pursuant to these two statutes are analyzed together.  *See Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("The proper analysis under Title VII and the [PHRA] is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.").

municipal agency in determining its liability under § 1983.").  Because SEPTA cannot be held

liable for employee actions through vicarious liability, Plaintiffs here must show that SEPTA

"implemented or executed a policy statement, ordinance, regulation, or decision officially

adopted and promulgated, or acted pursuant to governmental custom even though such a custom

has not received formal approval through the body's official decision-making channels."

*Jordan*, 2012 WL 4815414, at *16 (internal quotation marks and alterations omitted) (quoting

*McGovern*, 554 F.3d at 121).

When evaluating discrimination claims under Title VII, the PHRA, or 42 U.S.C. §§ 1981

and 1983,[10] courts apply the familiar three-part burden-shifting framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, a

plaintiff must first establish a *prima facie* case for discrimination.  *Id.* at 802.  If a plaintiff does

so, the burden then shifts to the defendant to advance a legitimate, non-discriminatory reason for

its actions.  *Id.* at 802–03.  If the defendant advances a legitimate, non-discriminatory reason for

its actions, the burden shifts back to the plaintiff to prove that the defendant's proffered reason is

merely a pretext for discrimination.  *Id.* at 806–07.  The *McDonnell Douglas* framework "was

never intended to be rigid, mechanized or ritualistic.  Rather, it is merely a sensible, orderly way

to evaluate the evidence in light of common experience as it bears on the critical question of

discrimination."  *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990).

To establish a *prima facie* case of disparate treatment based on race, whether under §

1981, Title VII, or the PHRA, a plaintiff must show (1) that he was a member of a protected

class; (2) that he was qualified for the position; (3) that he suffered an adverse employment

---

[10] "Section 1983 race discrimination claims follow the standard employed in Title VII disparate treatment claims and, absent direct evidence of discrimination, are analyzed under the familiar *McDonnell Douglas*[] framework applied to Title VII and Section 1981 claims involving circumstantial evidence of discrimination."  *Holt v. Pennsylvania*, No. CV 10-5510, 2015 WL 4944032, at *13 (E.D. Pa. Aug. 19, 2015).

action; and (4) circumstances give rise to an inference of unlawful discrimination.  *See, e.g.*, *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999).  A plaintiff may satisfy the fourth prong through comparator evidence—in other words, "by showing that similarly situated individuals outside the plaintiff's class were treated more favorably [than the plaintiff]." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 273–74 (3d Cir. 2010); *Tyler v. Se. Pennsylvania Transp. Auth.*, No. CIV.A. 99-4825, 2002 WL 31965896, at *3 (E.D. Pa. Nov. 8, 2002), *aff'd sub nom. Tyler v. SEPTA*, 85 F. App'x 875 (3d Cir. 2003) (reciting the fourth prong as "an employee in a non-protected class, otherwise similarly situated, was treated more favorably than Plaintiff").

To satisfy the fourth prong using comparators who are similarly situated, "the plaintiff must show that 'the other employee's acts were of comparable seriousness.'"  *Glenn v. Raymour & Flanigan*, 832 F. Supp. 2d 539, 548 (E.D. Pa. 2011) (quoting *Anderson v. Haverford C.*, 868 F. Supp. 741, 745 (E.D. Pa. 1994)).  While the relevant factors for comparators are fact-dependent, in the context of workplace discipline, it is significant whether "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish the conduct or their employer's treatment of them."  *Id.* at 549 (quoting *McCullers v. Napolitano*, 427 Fed. App'x. 190, 195 (3d Cir. 2011)).

Defendants primarily argue that Plaintiffs have each failed to demonstrate the *prima facie* case of race discrimination because their comparator evidence is inadequate.  Defendants separately urge that even if the Court determines that Plaintiffs can satisfy the *prima facie* case, Plaintiffs have not met their *McDonnell Douglas* burden to show that Defendants' proffered reasons for their actions were pretextual.

11

The Court agrees with Defendants that Plaintiffs' comparator evidence does not satisfy the fourth prong of the *prima facie* case.  Therefore, summary judgment is proper.  Moreover, if the comparator evidence was satisfactory, summary judgment would still be warranted because none of the Plaintiffs have pointed to evidence showing that Defendants' proffered reasons for their actions were pretextual.  Consequently Plaintiffs cannot satisfy their burden under *McDonnell Douglas*.

### 1.     Kelvin Holly

Mr. Holly has failed to proffer similarly situated individuals that may be used as comparator evidence of discrimination, and therefore, he cannot satisfy the *prima facie* case.  Mr. Holly suggests five bus operators to be evaluated as comparators: (1) Daniel Vaughan, (2) Robert Perna, (3) Stephen Coia, (4) Domenic Parenti, and (5) Elliot Lopez.[11]

Mr. Vaughan, a Caucasian former bus operator who worked out of the Comly District, struck a pedestrian who was crossing the street.  Mr. Vaughan called the Control Center and handed out incident cards at the time of the accident. While SEPTA initially recommended discharge, the Union grieved the discipline and was ultimately given a one day administrative suspension.

Mr. Perna, a Caucasian bus operator in the Callowhill District, twice struck pedestrians— in July and November 2014.  In July 2014, a pedestrian walked into the side of the bus.  He called the Control Center immediately thereafter and did not move the bus. While SEPTA initially recommended discharge, he entered into a settlement with SEPTA through the Union

---

[11] The Court is limiting its analysis to the comparator conduct that is factually similar to the instant case. *Glenn*, 832 F Supp. 2d at 548–49 ("While similarly situated does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects" (internal quotation marks omitted)).  Mr. Holly points to several dissimilar incidents on the record that have no bearing on this case.  For example, he references Mr. Perna's receipt of a one-day administrative suspension for not wearing a seatbelt and a time when Mr. Perna was not disciplined after a ramp he was operating closed on a passenger's toe.  The Court will not address such dissimilar conduct.

that reduced his discipline to a written warning.  In November 2014, a pedestrian walked into the bus's mirror, and he handed out incident cards and called the Control Center immediately.  The record does not show that he was disciplined after the November 2014 incident.

Mr. Coia, a Caucasian bus operator in the Comly District, was involved in an accident when a pedestrian fell under the rear wheels of his bus, was run over, and ultimately died.  At the time of the accident, he called the Control Center and a supervisor and ambulance came to the scene.  Mr. Coia received a "preventable" classification from SEPTA, and testified at his deposition that he was not otherwise disciplined.

Mr. Parenti, a Caucasian bus operator in the Comly District, struck a pedestrian at an intersection and called the Control Center immediately.  He received a one-day suspension.

Mr. Lopez, an Hispanic bus operator in the Southern District, allegedly struck a pedestrian, but did not remember whether he was disciplined for the incident.  Separately, he was charged with failure to call control center following an accident with an unmanned vehicle.

Key differences distinguish Mr. Holly from the proffered comparators such that they are not "similarly situated" and cannot be relied upon to satisfy the fourth prong of the *prima facie* case.  None of Mr. Holly's suggested comparators were on Last Chance Agreements at the time they were involved in incidents with pedestrians.  The Last Chance Agreement to which Mr. Holly was subject stated plainly that "should Mr. Holly be charged with committing *any* infraction for which discipline is justified, he shall be subject to immediate discharge."  Def. Ex. I.  Because none of the proffered comparators were in a similar procedural posture as Mr. Holly when he was disciplined for the September 2013 incident, SEPTA's response to the alleged comparators' incidents cannot serve as a measure of discriminatory treatment.[12]

---

[12] Mr. Holly contests the Last Chance Agreement itself, arguing that it was time-barred, that Mr. Holly entered into it under duress, and that it was imposed in a discriminatory manner.  Whether the Last Chance

Moreover, the parties have not pointed to any evidence that any of the alleged offenders moved his bus without authorization following an incident or failed to immediately contact the SEPTA Control Center.[13]  As a result, none of the alleged comparators were charged with the same violations in the same circumstances as Mr. Holly.  While the comparators did receive less severe discipline than Mr. Holly, the factual circumstances leading to their discipline differed significantly from the conduct and procedural posture here.[14]

Because Mr. Holly cannot make out his *prima facie* case, summary judgment for Defendants is proper.  However, Even if Plaintiff had established the *prima facie* case of race discrimination, he has not shown that Defendants' legitimate, nondiscriminatory reason for termination—violating an array of SEPTA rules while subject to a Last Chance Agreement—was pretextual.  Under *McDonnell-Douglas*, the burden then shifts to the plaintiff to show pretext. To show pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or

Agreement itself, which Mr. Holly signed prior to the incident that led to his termination, was proper is not an issue here.  The propriety of the Last Chance Agreement is separate and apart from whether Mr. Holly's November 2013 termination was motivated by racial discrimination.  Further, the Court can find no evidence in the record supporting Mr. Holly's argument that SEPTA engaged in a policy or practice of imposing Last Chance Agreements in a discriminatory manner.  Moreover, as explained in greater detail in Section III.A.3 below, the Union (not SEPTA) initiated a Last Chance Agreement.

[13] Mr. Holly takes great pains to characterize the events of September 2013 as an "incident," as opposed to an "accident" in an effort to downplay the seriousness with which Mr. Holly was required to respond.  This effort is ultimately fruitless, however, because BDR 53.A&B applies to accidents "however slight."  *See* Def. Ex. N.

[14] Defendants point out that the bulk of the comparators did not share Mr. Holly's supervisor—Mr. Vogelman—and were not assigned to Mr. Holly's district.  Mr. Holly takes the position that it is irrelevant whether a comparator had a different supervisor in this case because SEPTA's Labor Relations Managers have the final say with respect to disciplinary decisions.  Indeed, "[t]he Supreme Court has held that evidence offered in a discrimination case concerning purported comparators with different supervisors is neither per se admissible nor per se inadmissible."  *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (concluding that the comparators offered by the plaintiff that were not subject to the same decision-authority, while not per se inadmissible, "d[id] not cast doubt" on the defendants motive for terminating the plaintiff).  It is clear from the briefing that multiple individuals from SEPTA and the Union are involved in disciplinary matters.  While involvement by multiple individuals may downplay the relevance of any one supervisor in particular in this context, it does nothing to undermine the comparators' other distinguishing characteristics.  Consequently, the comparators put forth by Mr. Holly do not cast doubt on the rationale behind Mr. Holly's termination.

(2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). "Comparative evidence may show pretext, [but] it is only relevant if the comparators are similarly situated." *Maull v. Div. of State Police*, 39 F. App'x 769, 773 (3d Cir. 2002) (internal quotation marks omitted). Beyond the fact that the comparators put forth by Mr. Holly did not engage in similar conduct, they were not similarly situated with respect to disciplinary posture because none of them were on Last Chance Agreements with SEPTA. Consequently, the comparators received from SEPTA cannot show pretext.

For the foregoing reasons, the Court will grant summary judgment for Defendants on Mr. Holly's claims under 42 U.S.C. §§ 1981 and 1983, Title VII, and the PHRA.

## 2.     Ernest Foye

Mr. Foye did not respond to Defendants' Motion for Summary Judgment. The Court granted Mr. Foye additional time to file a response to the Motion after his former counsel's withdrawal from the case.[15] After Mr. Foye failed to file a response by the first deadline set by the Court, the Court again directed him to file a response and required him to appear at the hearing addressing Defendants' Motion for Summary Judgement. Mr. Foye neither filed a response nor appeared at the hearing. Because the time for response has long passed, the Court considers the Motion as unopposed, but will, nonetheless, evaluate the efficacy of the Motion on its merits.

Like Mr. Holly, Mr. Foye set forth comparator evidence to support his discrimination claims, and his alleged comparators suffer similar flaws. Defendants raised issues with the four

---

[15] The Court granted Mr. Foye's former counsel's motion to withdraw based upon Mr. Foye's unresponsiveness.

comparators Mr. Foye referenced in the Amended Complaint: (1) Thomas D'Achino, (2) Elliot Lopez, (3) Cathy Wilkes, and (4) Christopher Lopez.[16]

Mr. D'Achino is a Caucasian former SEPTA "bus blocker" in the Southern District who plaintiff alleges "came to work drunk, was given an alcohol test and proved positive and also assaulted a dispatcher."  Am. Compl. ¶ 43.  In 2003, Mr. D'Achino was discharged because he tested positive for alcohol while on duty, in violation of the CBA.  Mr. D'Achino was later reinstated as part of a settlement between SEPTA and the Union.

Elliot Lopez is a Hispanic bus operator in the Southern District who had an altercation with a passenger in March 2013.  A customer on Mr. Lopez's bus filed a complaint with SEPTA alleging, among other things, that Mr. Lopez pushed another passenger off the bus.  Mr. Lopez was charged with violating an array of rules.  Mr. Vogelman, who supervised Elliot Lopez, recommended discharge.  The Union grieved the recommendation and ultimately negotiated a settlement with SEPTA, whereby he was reinstated.

Cathy Wilkes is a Caucasian bus operator who Mr. Foye alleges assaulted a passenger on the bus.  Am. Compl. ¶ 48.  Christopher Lopez, a Hispanic male, allegedly "physically threw someone off the bus."  Am. Compl. ¶ 45.  The parties have not pointed to any evidence that such incidents took place, and neither Ms. Wilkes nor Mr. Lopez were deposed in this case. The Court finds, therefore, that they cannot serve as comparators for Mr. Foye.

Neither Mr. D'Achino nor Elliot Lopez is an appropriate comparator.  Not only did Mr. D'Achino hold a different position and supervisor when the incident occurred, the allegation that Mr. D'Achino assaulted a dispatcher does not appear to be supported by the record.  Even if he had assaulted a dispatcher in the course of being confronted about a potential alcohol issue at

---

[16] While the Amended Complaint references additional comparators, the Court agrees with Defendants' conclusion that the other comparators did not bear sufficiently similar facts to warrant evaluation.

work, his conduct was so dissimilar that he could not serve as a comparator.  Moreover, Mr. D'Achino's reinstatement with SEPTA resulted from a negotiated settlement, which was not pursued in Mr. Foye's case.  Likewise, while Elliot Lopez engaged in similar conduct and received similar rules violations, he is not an appropriate comparator because his reinstatement followed a negotiated settlement between the Union and SEPTA.  Especially given that SEPTA reached a negotiated settlement, it could have believed that Mr. Lopez's conduct warranted different discipline.  *See Glenn*, 832 F. Supp. 2d at 549–50 (concluding that the two individuals were not similarly situated because "[a]n employer could still reasonably believe that their respective conduct . . . required different levels of discipline").

Because Mr. Foye has not put forth sufficient comparator evidence and has not otherwise shown the fourth element of the *prima facie* case for race discrimination, Defendants are entitled to summary judgment on Mr. Foye's claims under 42 U.S.C. §§ 1981 and 1983, Title VII, and the PHRA.[17]

### 3.      Legene Edwards

Like the other Plaintiffs, Mr. Edwards relies on comparator evidence to satisfy the fourth prong of the *prima facie* case of race discrimination.  And, like the others, his comparator evidence is not sufficiently similar and the Court will grant summary judgment for Defendants as to Mr. Edwards claims under 42 U.S.C. §§ 1981 and 1983, Title VII, and the PHRA.

---

[17] As with Mr. Holly, even if the Court were to conclude that the comparator evidence satisfied the *prima facie* case, Defendants would remain entitled to summary judgment because Mr. Foye cannot demonstrate pretext. Mr. Foye admitted to the conduct during his Labor Relations Hearing, and ample evidence (including video surveillance) was reviewed by SEPTA supervisors.  Mr. Foye has not put forth evidence showing that he was terminated for any reason other than the rule violations to which he admitted, and therefore, he has not shown pretext.

Mr. Edwards points to Mr. Vaughan as a comparator and alleges that Mr. Vaughan had accumulated more attendance points than Mr. Edwards, but was not terminated.[18] Mr. Vaughan is a SEPTA employee subject to the same disciplinary rules and CBA as Mr. Edwards. Mr. Vaughan was dropped from SEPTA's rolls in July 2014 for exceeding his allotted sick leave. He was later reinstated pursuant to a negotiated settlement between SEPTA and the Union. Mr. Vaughan was never supervised by Mr. Vogelman, and Mr. Vaughan was not on a Last Chance Agreement when he was discharged. In fact, he was not eligible for a Last Chance Agreement in 2014 because he received one in 2004 when he violated the attendance points system. Not only was Mr. Vaughan not subject to a Last Chance Agreement, he worked in a different department and under a different supervisor than Mr. Edwards.

While Mr. Edwards and Mr. Vaughan were subject to the same CBA, they were in entirely different disciplinary postures at the time of their terminations. Unlike Mr. Edwards, whose discharge was the result of progressive discipline under the CBA, Mr. Vaughan was dropped from the rolls due to expiration of sick leave. Moreover, Mr. Vaughan's discharge was not triggered by violation of a Last Chance Agreement. Indeed, he could not have been subject to one. Furthermore, Mr. Vaughan was reinstated as part of a negotiated settlement with the Union. Because there are differing and mitigating circumstances that significantly distinguish Mr. Vaughan's conduct and SEPTA's treatment of him, he cannot serve as a comparator.

Mr. Edwards—making reference to Mr. Vaughan, other comparators in the Amended Complaint, and other Plaintiffs in this case—appears to contest the imposition of a Last Chance Agreement on him and other African American bus operators generally, urging that SEPTA has a policy of imposing such Agreements in a discriminatory manner. This argument fails to

---

[18] Mr. Edwards also references Mr. Holly and other comparators in the Amended Complaint, but despite being subject to the same CBA and disciplinary rules, none engaged in similar conduct so any comparisons are unavailing.

recognize, however, that the *Union* has to request a Last Chance Agreement—SEPTA does not

unilaterally imposed one upon employees.  The CBA explains:

> If the discharge is upheld through the Labor Relations step of the grievance procedure, the employee's active employment will terminate unless the Union requests final settlement of the matter, with a "last chance."  Such a request by the Union pursuant to this paragraph shall not be cited as, or constitute a precedent with respect to any matter or discipline. Should the Union not request such a final settlement, the grievance concerning the discharge may be filed for arbitration . . .

CBA, Art. II Section 201(C)(6)(ii). In other words, the Last Chance Agreement arises as an

option during the grievance process and must be affirmatively requested by the Union itself.

Indeed, the record here includes a letter to SEPTA from the Union on Mr. Edwards's behalf

stating "[i]n this instance *the Union* is recommending that Mr. Edwards be afforded the

opportunity of a 'Last Chance', as negotiated in our Labor Agreement effective March 15,

1992."  Def. Ex. O (emphasis added).  Mr. Edwards has not pointed to any evidence that SEPTA

forced an agreement upon him.[19]  To the extent that Plaintiffs allege a discriminatory policy or

practice through their allegation that Last Chance Agreements are administered in a

discriminatory manner, the Court rejects it.  Mr. Edwards has not pointed to any evidence to

support his bare assertion that SEPTA discriminatorily imposed Last Chance Agreements on

African-American employees or any evidence that the grievance process works differently than

as outlined by the CBA.[20]

---

[19] While there is a notation on the charge sheet that Mr. Edwards indicated he was signing the Last Chance Agreement in protest, even if he had not signed the agreement, he likely would have been discharged on August 2, 2013 pursuant to the letter following the Labor Relations hearing.

[20] Plaintiffs generally allege violations of the Fourteenth Amendment.  While Plaintiffs do not explicitly bring a procedural due process claim, Mr. Edwards's suggestion that the disciplinary process he engaged in prior to termination was somehow faulty implies such a challenge.  A procedural due process claim would also fail here because Plaintiffs are members of a union.  The Third Circuit Court of Appeals has held that "[w]here a due process claim is raised against a public employer, and grievance and arbitration procedures are in place, we have held that those procedures satisfy due process requirements even if the hearing conducted by the Employer inherently biased."  *Dykes v. Se. Pennsylvania Transp. Auth.*, 68 F.3d 1564, 1571 (3d Cir. 1995) (internal quotation marks and

Even if the Court were to determine that Mr. Edwards had satisfied the *prima facie* case, he has failed to produce sufficient evidence showing that Defendants' proffered reason for terminating Mr. Edwards was pretextual. Mr. Edwards has not pointed to any evidence on the record showing that he was terminated for any other reason that violating the Last Chance Agreement. And, for the same reasons detailed above, SEPTA's differing approach towards Mr. Vaughan cannot be used to show pretext because Mr. Vaughan was not "similarly situated." Accordingly, the Court grants summary judgment for Defendants on Mr. Edwards's claims under Title VII, the PHRA, and §§ 1981 and 1983.

### B.      Mr. Edwards's FMLA Claims

Congress passed the FMLA in order "to balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1). Under the FMLA, eligible employees are entitled to a total of 12 workweeks of leave during any 12-month period in order to care for an employee's spouse if the spouse has a serious health condition. 29 U.S.C. § 2612(a)(1). "Even when these qualifying circumstances exist, employees cannot invoke rights under the FMLA if they fail to provide adequate notice of their need for leave." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012) (citing 29 U.S.C. § 2612(e)). The requirement to provide adequate notice extends to circumstances where leave is not foreseeable. "When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303

---

alterations omitted) (quoting *Jackson v. Temple University*, 721 F.2d 931 (3d Cir.1983)). The *Dykes* Court concluded that "[e]ven where, as here, a plaintiff alleges that the defendants [SEPTA and Local 234] acted in concert to deprive him both of a meaningful hearing and of arbitration, we believe that the administrative process in place has incorporated safeguards adequate to resolve these allegations in a manner consistent with the demands of due process." 68 F.3d at 1572. Accordingly, challenges to the underlying grievance procedure are without merit.

Once an employee invokes FMLA rights, employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" those FMLA rights. 29 U.S.C. § 2615(a)(1). Likewise, employers cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). "The former provision is generally, if imperfectly, referred to as 'interference' whereas the latter is often referred to as 'retaliation.'" *Lichtenstein*, 691 F.3d at 301 (citing *Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005)). An employee may be able to bring both an interference and a retaliation claim if he is terminated for requesting FMLA-protected leave. *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009).

While the Amended Complaint does not specify which FMLA claims Mr. Edwards alleges, the briefing reveals that he intends to bring both an interference claim and a retaliation claim. For the reasons expressed below, the Court will grant summary judgment for Defendants on both claims.

### 1.    FMLA Interference

To establish an interference claim under the FMLA, a plaintiff must show that:

(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Capps v. Mondelez Global, LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014)). In other words, the employee needs to show that he was entitled to FMLA benefits and that the employer denied them. "Unlike an FMLA retaliation claim, '[a]n interference action is not about discrimination, it is only about whether the employer

provided the employee with the entitlements guaranteed by the FMLA.'" *Capps*, 847 F.3d 144,

155 (3d Cir. 2017) (quoting *Callison*, 430 F.3d at 120).

Defendants argue that Mr. Edwards has failed to demonstrate that he was entitled to

benefits under the FMLA and therefore cannot satisfy the fifth prong of the *prima facie* case.

They urge that Mr. Edwards has failed to rebut the AmeriHealth letter denying his July 2013

request for FMLA benefits, so he cannot show that the absence that led to his termination was

FMLA-protected.  Mr. Edwards, on the other hand, contends that Defendants "failed to wait for

Edwards to obtain his FMLA request approval in 2013, which would have covered the absences

used by Defendants to assess attendance points against him leading to his termination."  Pl.

Mem. in Opp. at 4.  He points out that it was common practice for AmeriHealth approve

previously denied applications when provided with more information, and attendance points that

SEPTA had previously assessed would be removed upon learning of FMLA approval.

Defendants do not deny that they engaged in this practice.[21]

Mr. Edwards takes the position that he was erroneously assessed attendance points for

absences on August 16, 2011 and June 24, 2013 because both of those events were FMLA-

protected.  Only the June 24, 2013 absence triggered the Last Chance Agreement violation that

---

[21] The FMLA places some affirmative obligations on employees.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 142 (3d Cir. 2004) *holding modified by Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) (explaining that the regulations require employers to provide notice of FMLA rights and each time the employee requests leave, the employer must provide a detailed explanation of the employee's obligations and any potential consequences for failing to comply); *see also Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 157 (3d Cir. 2015) (citing 29 U.S.C. § 2613(b) and 29 C.F.R. § 825.305(c) and concluding that employers must advise employees of deficiencies in their medical certificates submitted with FMLA applications and provide the employee with seven days to cure the deficiency).  Mr. Edwards does not argue that Defendants failed to comply with these clear-cut affirmative obligations under the Act.  Instead, he argues that SEPTA was obligated to wait, seemingly as long as it took, for Mr. Edwards to perfect his FMLA application.  Generally, however, "there is no FMLA right [that employees] . . . be 'left alone,'" and "[n]othing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave" by enforcing internal policies that do not conflict with the FMLA.  *Callison*, 430 F.3d at 121.  There is no argument here that Defendants' policies conflict with the FMLA.

led to Mr. Edwards termination, however.  Accordingly, the Court will focus on the circumstances of that absence.[22]

Mr. Edwards had additional absences that incurred attendance points in June 2013, after receiving the Discharge with Dignity but before his termination.  The record shows that he was assessed six points for an absence on June 14, 2013 due to a pattern of Friday absences, bringing his attendance point total to 20.  Pl. Ex. P-5.[23]  Mr. Edwards was absent again on June 24, 2013, and the resulting points assessed against him triggered a step in discipline.  SEPTA records show that he was out for a "tooth" issue on June 24th.  Def. Ex. M.  Mr. Edwards asserts that he cared for his wife that day.

Mr. Edwards recognizes that his FMLA approval expired in October 2012.  *See* Edwards Responses to SEPTA's Suggested Timeline of Events at 6.  While there is evidence supporting that Defendants were aware of Mr. Edwards's intention to renew his FMLA approval as early as April 2013, AmeriHealth's own records present a different timeline.  An AmeriHealth Note shows that Mr. Edwards did not file a recertification for the FMLA period ending on October 20,

---

[22] Setting aside the fact that Mr. Edwards's August 16, 2011 absence was unrelated to the Last Chance Agreement violation triggering his termination, the challenge associated with that event lacks merit.  There is evidence that Mr. Edwards was approved to take intermittent FMLA leave between August 16, 2011 through October 20, 2012, but Defendants argue that assessing points for the August 16th absence was warranted because Mr. Edwards never called AmeriHealth to report FMLA leave that day.  AmeriHealth records shows that Mr. Edwards was out on August 8th and August 16th and that those absences were tagged as "no call days," where FMLA benefits were denied.  Def. Ex. G.  AmeriHealth's letter approving Mr. Edwards's initial FMLA leave request explained that "[a]n employee is required to follow an employer's normal call-out and call-in procedures when taking FMLA leave. If you do not contact SEPTA and AmeriHealth Casualty prior to requesting FMLA time, you may not be approved and could be subject to the attendance point policy."  Pl. Ex. P-3.  Failure to provide notice risks "hav[ing] the FMLA leave request delayed or denied."  *Id.*

Indeed, an employer does not "interfere" if it enforces its internal leave policy, as long as the policy does not conflict with the FMLA.  *See Callison*, 430 F.3d at 121 (affirming the district court's grant of summary judgment where an employee did not comply with employer's internal policy).  Because there is no evidence that the SEPTA Policy conflicts with the FMLA, and Mr. Edwards has not pointed to any evidence showing that he called AmeriHealth to report the August 16th absence, his argument regarding the points assessment lacks merit.

[23] According to a note from AmeriHealth on October 2, 2013, Mr. Edwards called SEPTA, but not AmeriHealth, for the absence on June 14th.  Def. Ex. H.  In his affidavit, Mr. Edwards contends that his June 14, 2013 absence was FMLA-approved and that he called AmeriHealth at 8:00 a.m.  Pl. Ex. K ¶ 11.

2012.  The Note, memorializing a conversation an AmeriHealth employee had with Mr. Edwards on November 9, 2012, stated that "leave is now closed."  It also stated that AmeriHealth mailed a recertification form to Mr. Edwards on that date.  Another Note in AmeriHealth's internal system confirms that July 1, 2013 was the operative start date for Mr. Edwards's requested FMLA leave. The Note reported that as of October 20, 2013, Mr. Edwards "claim was closed 2012 and a new claim [was] opened 7/2013."  Def. Ex. H.

AmeriHealth issued a letter showing that Mr. Edwards sought FMLA leave beginning July 1, 2013.  The letter stated that "AmeriHealth has received your request for leave under the Family and Medical Leave Act (FMLA) beginning 7/1/2013 due to Care of a family member. This notice is to inform you that you are eligible."  Pl. Ex. P-16.  In other words, the record shows that Mr. Edwards was *eligible* to receive FMLA leave as of July 1, 2013, but was not yet *approved* for leave.  In the letter, AmeriHealth explained that leave would only be classified as FMLA "[i]f [his] leave is approved," and that he "w[ould] be notified when a decision has been made."

In order for FMLA leave to be approved, Mr. Edwards was required to submit additional paperwork including a Certification of Health Care Provider Form. SEPTA's FMLA Policy imposes certification requirements for employees seeking leave.  The Policy states:

> Employees are obligated to cooperate with the TPA in the flow of information necessary to administer FMLA leave. This includes, upon request, submitting a complete and sufficient certification to support the need for leave.  Failure to do so may result in some or all of an absence not being treated as FMLA leave.
>
> For leaves involving a serious health condition, the employee will be required to have his/her treating health care provider complete a Medical Certification Form in a timely manner. . . . It is the employee's responsibility to submit the form to the TPA in a timely manner, which means the employee must make a diligent, good faith effort to return the form within fifteen (15) calendar days from the date the form is issued to the employee.

Pl. Ex. P-1.  Mr. Edwards failed to comply with the Policy.  On July 24, 2013, AmeriHealth sent a letter to Mr. Edwards informing him that his FMLA leave request was not approved because he had not submitted a provider certificate.  Def. Ex. H.  When Mr. Edwards called AmeriHealth in October 2013, the representative he spoke with reiterated that he was not approved because he had not timely returned the provider certificate.[24]

Based on the points assessed for his June 24, 2013 absence, Mr. Edwards was again charged with substandard attendance.  Mr. Edwards asserts that he showed the July 1, 2013 letter from AmeriHealth to Mr. Vogelman during what was supposed to be an informal hearing on July 26, 2013.  The Charge Sheet from July 26, 2013 shows that the hearing was held in abeyance pending the outcome of Mr. Edwards's FMLA request.

The Union requested a Last Chance Agreement on August 2, 2013 as part of its grievance of Mr. Edwards's May 15, 2013 Discharge with Dignity.  On August 12, 2013, the parties met again regarding the June 24, 2013 substandard attendance charge.  In that meeting, Mr. Edwards received the Last Chance Agreement that the Union had requested on August 2nd, and he was discharged.  In essence, because Mr. Edwards executed a Last Chance Agreement in lieu of discharge in connection with his May 15, 2013 grievance procedure, he was on probation when he accrued enough attendance points to push him over the threshold for discipline.[25]  Mr. Edwards's defense—as memorialized in notes from the meeting—was that he was not aware of

---

[24] Mr. Edwards argues that he was unable to return the certificate in a timely manner because the medical provider was unavailable.  The record shows that the certificate was signed on August 30, 2013.

[25] The discharge was upheld at both the formal hearing and labor relations hearing steps.  In the Labor Relations step decision, SEPTA explained that

> Although Operator Edwards didn't sign his Work Resumption/Last Chance agreement until August 12, 2013, his one year probationary period commenced May 15, 2013.  During his probationary period, he continued to accumulate attendance points until ultimately reaching 22 points.  This constituted an infraction for which discipline is justified and thereby violated the last chance agreement.

Def. Ex. T.

the Agreement and that because he signed it on the day of his discharge, it was signed under protest.

The undergirding of Mr. Edwards's FMLA claim is the idea that because AmeriHealth and/or SEPTA may have previously exercised its discretion in accepting late paperwork, they were obligated to do so with respect to his July 2013 claim.  Mr. Edwards alleges that he received the required oncologist certification on August 30, 2013—over a month after it was originally due—and that he then submitted it to AmeriHealth.  He takes the position, in essence, that Defendants interfered with his FMLA rights by not waiting for him to perfect his application.

The record demonstrates that SEPTA would sometimes, in fact, choose to alter attendance records in light of later FMLA approval.  Mr. Edwards points to an array of Attendance Deviation Notices from July and August 2012 showing that absences were marked as FMLA-approved after the August FMLA request was approved.  The fact that SEPTA removed attendance points in light of later FMLA approval also appears to be in line with SEPTA's attendance point policy.  However, in those instances, as now, the FMLA does not require SEPTA or AmeriHealth to disregard its internal policies in order to facilitate an employees' request.  Indeed, as noted above, an employer does not "interfere" if it enforces its internal leave policy, as long as the policy does not conflict with the FMLA.  *See Callison*, 430 F.3d at 121.  Indulgences do not necessarily become revisions to the Policy.

Furthermore, this case differs from those where courts have allowed FMLA interference claims to proceed on the basis of an internal policy that altered employees' understanding of the scope of FMLA benefits.  The FMLA permits employers to enact leave policies that are more generous than the one the FMLA requires.  *See* 29 U.S.C. § 2653.  Courts generally "have been

reluctant to extend the ability of a Plaintiff to bring FMLA interference claims, or extending the FMLA's right to reinstatement beyond twelve weeks, when the employee takes leave beyond the twelve-week FMLA entitlement period and is subsequently terminated." *Thurston v. Cherry Hill Triplex*, 941 F. Supp. 2d 520, 529 (D.N.J. 2008). While doing so is by no means universal, some courts have permitted interference claims when the employee reasonably believed a generous internal extended leave program provided FMLA protection. *See, e.g.*, *Santosuosso v. NovaCare Rehabilitation*, 462 F.Supp.2d 590, 597–98 (D.N.J.2006) (holding that "in light of the Congressional encouragement for employers to provide more generous benefits than mandated by law, . . . [] [the employee] should not lose her FMLA protections . . . . "), *Fry v. First Fidelity Bancorporation*, No. A. 95–6019, 1996 WL 36910 at *1 (E.D.Pa.1996) (holding that failure to notify employees about conflicts between an internal leave policy and the FMLA, resulting in an employee unwittingly forfeiting FMLA protections, may constitute interference); *c.f Dogmanits v. Capital Blue Cross*, 413 F. Supp. 2d 452, 462 (E.D. Pa. 2005) ("[E]mployees who exhaust the twelve weeks of leave provided under the FMLA stand to lose their entitlement to job restoration even if their employers provide additional, non-FMLA, leave."); *Panto v. Palmer Dialysis Ctr./Total Renal Care*, No. CIV.A. 01-6013, 2003 WL 1818990, at *6 (E.D. Pa. Apr. 7, 2003) (rejecting Plaintiff's argument that Defendant is estopped from asserting that her leave was confined to twelve weeks under the FMLA on the basis of a more generous internal leave policy and concluding that "Defendant's policy provides a more generous benefit, but it does not convert this leave to an entitlement under the FMLA.")

Not only is the Court not compelled to allow an interference claim to proceed on an estoppel theory, the SEPTA points reversal practice in this case does not amount an internal policy akin to the ones some courts have found support FMLA interference claim. The

employers in *Santosuosso* and *Fry* had formal internal extended leave policies that went beyond the scope of the FMLA.  There is no such allegation here—SEPTA's policy appears to mirror the FMLA requirements.  Moreover, removing points in light of later FMLA approval does not alter an employee's baseline FMLA protections.  In other words, the SEPTA leave policy does not give the impression that it is more generous that the one mandated by FMLA.   The FMLA does not require SEPTA or AmeriHealth to disregard its internal policies in order to facilitate an employees' request, and, in fact, commands employees to follow them.   29 C.F.R. § 825.303 ("When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances.").  And an employer does not "interfere" if it enforces its internal leave policy.

The Court commends employers' flexibility in processing FMLA claims for employees tending to loved ones and, on a human needs basis where difficult choices are often demanded, sympathizes with Mr. Edwards.  But the Third Circuit Court of Appeals has "made it plain that, for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld." *Capps*, 847 F.3d at 156 (quoting *Ross*, 755 F.3d at 192).  Here, Mr. Edwards's FMLA claim was denied, in keeping with the published and proper policy.  Consequently, he cannot proceed with his interference claim and summary judgment is appropriate.

## 2.     FMLA Retaliation

To establish a retaliation claim under the FMLA, a plaintiff must show that (1) he invoked a right to FMLA-qualifying leave; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to his leave. *See Erdman*, 582 F. 3d at 508–09.

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law."

*Lichtenstein*, 691 F.3d at 302.  Accordingly, claims based on circumstantial evidence are assessed under the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and claims based on direct evidence are assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989).  *Lichtenstein*, 691 F.3d at 302; *accord Ross*, 755 F.3d 185, 193 (3d Cir. 2014).

> Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. If the plaintiff succeeds, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination.

*Ross*, 755 F.3d at 193 (internal citations omitted).[26]  There is no dispute that Mr. Edwards suffered an adverse action—termination of his employment.  Accordingly, Mr. Edwards must satisfy two elements of the *prima facie* case: invocation of the FMLA right and causation.  Mr. Edwards has not satisfied the *prima facie* case, and even if he had, Mr. Edwards has not shown that Defendants' proffered reason for terminating him—violating the Last Chance Agreement— was pretextual.  Therefore, the Court will grant summary judgment for Defendants.

### a.      Invoking a FMLA Right

An employee must provide adequate notice to his employer in order to invoke FMLA rights.  29 U.S.C. § 2612(e)(2).  "[T]he 'critical test' is not whether the employee gave every necessary detail to determine if the FMLA applies, but 'how the information conveyed to the employer is reasonably interpreted.'"  *Lichtenstein*, 691 F.3d at 303 (quoting *Sarnowski v. Air*

---

[26] Mr. Edwards makes fleeting reference to *Price Waterhouse*, observing generally that the mixed-motive framework applies to cases that present "direct evidence that [Mr. Edwards's] FMLA leave was a substantial factor in the decision to fire [him]."  Pl. Br. in Opp. 22.  Mr. Edwards fails to explain how the *Price Waterhouse* framework applies to this case or point to the purported direct evidence on the record, and the Court's review of the record does not identify evidence so "revealing of retaliatory animus that it is unnecessary to rely on the *McDonnell Douglas*" burden-shifting framework.  *Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 512 (3d Cir. 1997).  Furthermore, the Third Circuit Court of Appeals has not yet decided the issue of whether mixed-motive analysis remains viable for FMLA claims.  *See Capps*, 847 F.3d at 151 n.5, *Lichtenstein*, 691 F.3d at 302.  Given that Mr. Edwards has not shown that a mixed-motive framework is necessary, the Court will proceed under *McDonnell Douglas*.

*Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir.2007)).  While Defendants focus on July 2013 as the operative date of Mr. Edwards's request for FMLA leave, there is evidence on the record as early as April 2013 showing that SEPTA had notice of Mr. Edwards' intent to take FMLA leave.  On April 12, 2013, both Mr. Edwards and Mr. Vogelman signed a noted stating that "L. Edwards states he has filed for FMLA."  Pl. Ex. P-15.  Mr. Vogelman explained at his deposition that he agreed to postpone the informal hearing for Mr. Edwards's March 18, 2013 absence triggering discipline in order to "give[] [Mr. Edwards] the benefit of the doubt."   Vogelman Dep. 90:20-22.

Mr. Edwards gave additional notice in June 2013.  On June 14, 2013, there is "wife sick" notation in Mr. Edwards SEPTA attendance points history report.  Pl. Ex. P-6.  In *Lichtenstein*, the court vacated the District Court's grant of summary judgment when  the employer was on notice that one of the dates on which the plaintiff was absent from work was likely taken for an FMLA-qualifying reason and the employer had considered such activity a negative factor that further justified her termination.  691 F.3d at 309.  There, plaintiff had a "sick mom" notation in the entry log for one of the absences leading up to employment termination. That notation, along with other evidence, provided sufficient basis on which to infer notice to the employer. Accordingly, a jury could reasonably conclude in this case that Mr. Edwards had invoked his FMLA rights prior to June 24, 2013—the date on which he allegedly took FMLA leave and the absence that triggered his termination.

### b.   Causation

Mr. Edwards must also show that a reasonable jury could conclude that a causal link exists between Mr. Edwards's leave, which he alleges was FMLA-protected, and his employment termination.  Causation may be shown through temporal proximity alone if it is

unduly suggestive.  *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir.

2007).  When temporal proximity is insufficient, the Court evaluates the proffered evidence as a

whole, including "intervening antagonism or retaliatory animus, inconsistencies in the

employer's articulated reasons for terminating the employee, or any other evidence in the record

sufficient to support the inference of retaliatory animus."  *Id.* at 232–33. The Third Circuit Court

of Appeals has observed that the case law does not place limits on the type of evidence courts

consider in evaluating causation and has urged that courts view evidence using a wide lens.  *See*

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).  Employing a wide lens in

this case, however, does not reveal sufficient evidence that a jury could find causation.

 Here, Mr. Edwards does not attempt to satisfy causation based on temporal proximity and

instead argues that he has shown that Defendants engaged in a pattern of antagonism and

retaliatory animus following his invocation of FMLA leave.  He does not, however, point to any

specific evidence.  In fact, Mr. Edwards bases his FMLA claims, to some extent, on his

understanding that SEPTA engaged in a pattern of *accommodating* FMLA leave—not restricting

it—and his own expectation that Defendants would again wait for him to satisfy the Policy

requirements in his own time.  The record demonstrates that Defendants postponed an informal

hearing in April 2013 in light of the possibility that Mr. Edwards's absences would be FMLA-

protected and likewise held the July 26, 2013 hearing in abeyance due to the potential that his

absences were covered by FMLA leave.  Mr. Edwards has not pointed to evidence showing a

pattern of antagonism supporting causation.  Likewise, Mr. Edwards has not pointed to any

evidence on the record showing inconsistencies in the reasoning behind his termination.

 In *Lichtenstein*, the court found sufficient evidence of causation based upon temporal

proximity and the fact that it included the date on which it knew the plaintiff was absent due to

31

her "sick mom" in the list of absences it considered in deciding to terminate the plaintiff. This case is distinguishable from *Lichtenstein* with respect to causation, however, because there is a determination on the record about whether Mr. Edwards actually received FMLA approval. AmeriHealth denied Mr. Edwards's application for FMLA benefits for failure to comply with the requirements, and, as a result, Mr. Edwards' absence on June 24, 2013 was not FMLA-protected. Therefore, a reasonable jury could not infer causation.[27]

## CONCLUSION

For the foregoing reasons, the Court will grant the summary judgment for Defendants as to Mr. Holly's, Mr. Foye's, and Mr. Edwards's claims under 42 U.S.C. §§ 1981 and §1983, Title VII and the PHRA. The Court will also grant summary judgment as to Mr. Edwards's FMLA claims. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

[27] Even if the Court were to disregard AmeriHealth's denial of FMLA benefits at the *prima facie* case stage, the denial undermines any argument that the termination was pretextual. Mr. Edwards has not identified sufficient evidence to rebut Defendants' legitimate, non-retaliatory reason for his termination. Mr. Edwards was terminated for violating his Last Chance Agreement by accruing too many attendance points while on probation. Defendants argue that because Mr. Edwards ultimately cannot demonstrate that his absence on June 24, 2013— which triggered discipline under the attendance points system—was an FMLA-protected absence, he cannot show that Defendants' reason for termination was pretextual. Mr. Edwards does not put forth any evidence with respect to pretext, and the Court's review of the record does not unearth evidence that Mr. Edwards's termination was motivated by anything other than his violation of the Last Chance Agreement. While it may be the case that attendance points incurred for FMLA absences could support pretext (or causation, as addressed above), that situation does not present itself here, where Mr. Edwards's request for FMLA benefits was denied.